UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VERNON JONES, VLADIMIR KRULL, THOMAS MITCHELL, COMPTON MOHABIR, and CORYDON UMBER,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>TINA M. STANFORD, Esq., in her official capacity as Chairwoman of the New York Board of Parole; ANTHONY ANNUCCI, in his official capacity as Acting Commissioner of the Department of Corrections and Community Supervision,<br><br>　　　　Defendants. | CIVIL ACTION<br>Case No.: 20-cv-1332<br><br>**AMENDED COMPLAINT** |

## INTRODUCTION

1.　　This action is a constitutional challenge to the State of New York's bans on internet and social media access for all people under community supervision who are required to register under the Sex Offender Registration Act, regardless of whether they were ever convicted of a sex offense involving the internet.

2.　　The New York State Department of Corrections and Community Supervision ("DOCCS") imposes a release condition that completely bans all internet access for every registrant under community supervision. Additionally, New York's Electronic Security and Targeting of Online Predators Act ("e-STOP") mandates the imposition of a social media ban on certain categories of registrants under community supervision. DOCCS goes even further and applies this social media ban to all individuals on the registry under community supervision. These bans apply to individuals who have never used the internet or social media to commit an offense. As a result of

1

being unable to use the internet and social media, the plaintiffs struggle with the heavy burden of trying to navigate day-to-day life in a technology-dependent society.

3. Over the last two decades the internet—especially social media—has become an integral part of American life. Many Americans shop for necessities, search for housing, apply for jobs, take college courses, and stay connected to family members and friends on the internet. As of 2019, approximately 90 percent of American adults use the internet, while 69 percent use the social media platform Facebook and 73 percent use YouTube.

4. The internet is also an essential forum for political information and speech. Politicians and governmental entities use social media sites to disseminate information. Both Governor Cuomo and DOCCS have active social media accounts. President Donald J. Trump frequently uses the social media site Twitter to announce military, diplomatic, and domestic policy. Not only do these forums provide information to the public, they also allow people to communicate directly with their lawmakers by commenting on their posts. As New York's official policy on the state's use of social media declares, "New York State engages New Yorkers through many digital outlets, including NY.gov and Governor.NY.gov. Communicating with the State through social media enables you to contact us in a direct and meaningful way."

5. Recognizing the importance of the internet and social media for free speech, the United States Supreme Court held in *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), that "to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights."

6. However, the State of New York is cutting off the rights of thousands of people convicted of sex offenses to access these vital forums without any individualized assessment of whether they pose a risk to recidivate by using the internet. The plaintiffs in this case are individuals who are required to register as sex offenders under New York's Sex Offender Registration Act and

2

who are released on parole or post-release supervision, collectively referred to as "community supervision." They have never used the internet or social media to commit a sex offense, but as a result of New York State's blanket policies, are banned from meaningful access to these forums. The plaintiffs cannot look at family photographs posted on Facebook, search for gainful employment online, comment on pending legislation, or even look up facilities that provide mental health treatment. They have been cut off from the modern world.

7. The plaintiffs in this action seek declaratory and injunctive relief enjoining defendants from enforcing the unconstitutional provisions of e-STOP and the DOCCS Directives banning internet and social media access.

## PARTIES

### Plaintiffs

8. Plaintiff VERNON JONES resides in Brooklyn, New York. He is currently serving a term of post-release supervision until 2022. His release conditions bar him from accessing social media and the internet.

9. Plaintiff VLADIMIR KRULL resides in Yonkers, New York. He is currently serving a term of post-release supervision until 2025. His release conditions bar him from accessing social media and severely restrict his access to the internet.

10. Plaintiff THOMAS MITCHELL resides in Brooklyn, New York. He is currently serving a term of post-release supervision until 2028. His release conditions bar him from accessing social media and the internet.

11. Plaintiff COMPTON MOHABIR resides in Richmond Hill, New York. He is currently serving a term of post-release supervision until 2024. His release conditions bar him from accessing social media and the internet.

12. Plaintiff CORYDON UMBER resides in Pottersville, New York. He is currently on parole and will be on parole until 2022. His release conditions bar him from accessing social media and the internet.

### Defendants

13. Defendant TINA M. STANFORD is the Chairwoman of the New York State Board of Parole (the "Parole Board"). She is responsible for the administrative functions and daily operations of the Board and its staff, including the imposition of conditions on individuals required to register under the Sex Offender Registration Act on parole or on supervised release, and the social media ban required by e-STOP. Ms. Stanford is sued in her official capacity.

14. Defendant ANTHONY ANNUCCI is the Acting Commissioner of the New York Department of Corrections and Community Supervision. Mr. Annucci is responsible for overseeing the imposition and enforcement of conditions on Registrants on parole or supervised release, including the internet and social media bans. Mr. Annucci is sued in his official capacity.

### FACTS

### The Internet is a Pervasive Part of Everyday Life

15. Frequent engagement in online activities is an indispensable part of modern life. According to the Pew Research Center, as of 2019, nearly 90 percent of American adults make use of the internet on a daily basis.

16. On a typical day, American adults rely on the internet to read the news and check the weather; to send messages and make online calls to friends and family; to share their opinions with their elected officials and other members of the public; to look for jobs, housing, or community and support groups; to shop for and rate products; to make payments and manage finances; to look up directions; to make appointments; and to search for answers to all types of questions.

17. Today's job market uses the internet as a platform for job postings, networking opportunities, and informational and training materials of a wide and extensive nature. Many jobs require the use of online applications.

18. Even assuming that a person can find a job without the internet, almost all jobs today require internet use in one form or other. Whether the job demands internet access through email or a timecard software, inability to access the internet greatly hinders job opportunities.

19. Social media websites began as a way for people to reconnect with old acquaintances, to keep in touch with family and friends, and to network professionally – but have also become important for civic and political engagement. Much political discourse takes place on online news outlets and social media platforms such as Facebook. Politicians regularly communicate with their constituents on Twitter and other social media platforms, sometimes replacing the more traditional platforms like town halls with these modern methods of reaching the public.

20. Similarly, government agencies use the internet and social media to provide access to services, engage with the public, and livestream hearings or other activities. For example, the New York State Court System's internet portal provides a variety of resources for accessing services, legal help, and information about the legal system. The court system also uses social media to interact with the public. As it explains, "The New York State Unified Court System offers a variety of social media platforms to stay in the loop on court-related news — whether it's emergency weather closings, the latest decisions from the courts, timely podcasts on pressing issues, videos or snapshots."

21. Over half of American adults followed and engaged with politics on social media in 2018, and over 69 percent of American adults consider social media an important tool for getting elected officials to pay attention to issues and for creating sustained movements for social change.

Indeed, several important movements like #BlackLivesMatter and #MeToo have been amplified on social media.

22. Social media also provides a powerful, low-cost way for small business owners to market their businesses and interact with customers on the internet. It is estimated that more than 75 percent of small businesses used social media in 2018.

## Background on Community Supervision

23. In New York, individuals sentenced to an indeterminate term of imprisonment can be released from prison by the Parole Board after serving a certain amount of their sentence. On the other hand, those serving determinate sentences must be released after serving a certain portion of their sentence, at which point many will begin serving a term of post-release supervision. In New York, both parole and post-release supervision are referred to as "community supervision."

24. Many individuals released to community supervision are subject to both general and special conditions of release. General conditions of release are conditions that are imposed on all people released to community supervision, such as curfews and bans on the use of illicit drugs. The Parole Board and DOCCS can also impose special conditions of release either prior to an individual's release date or afterwards. The individual must be provided a written copy of all special conditions imposed.

25. Individuals who were convicted of certain statutorily enumerated sex offenses are required to register as "sex offenders" pursuant to New York's Sex Offender Registration Act (SORA) upon release to community supervision ("Registrants"). These offenses cover a wide range, from misdemeanors to serious felonies. For example, someone convicted of N.Y. Penal Law § 255.25 for marrying their adult relative must register as a "sex offender."

26. Prior to registration, these individuals must have judicial hearings to determine their risk level. The risk level adjudicated is supposed to correlate to the individual's risk to recidivate

sexually. Level One marks the lowest risk to recidivate. Levels Two and Three are moderate and high-risk levels respectively.

27. Each level comes with differing restrictions and registration requirements. All Registrants are subject to community notification, a process by which law enforcement can go to the neighbors of a Registrant and inform them of his or her presence in the neighborhood. Registrants adjudicated as Level Two and Three are placed on the public registry where their picture, physical description, and home address are posted on the internet. Level One offenders, while not on the public registry, are on a registry kept by local law enforcement. Additionally, Level Three offenders are subject to New York's statutory residency and movement restrictions prohibiting them from knowingly entering within 1,000 feet of a school ground.

28. Currently, 41,949 individuals are "registered sex offenders" in New York State, and thousands are under community supervision. In 2019, for example, over 1,600 individuals required to register as sex offenders were released to community supervision.

29. While it is commonly believed that people who commit sex offenses recidivate at high rates, this is simply false. After conducting a study of over 9,000 people convicted of sex offenses, the U.S. Department of Justice found that only 5.3 percent of these people committed another sex offense within 3 years of their release from prison.[1]

30. A study of 160,000 people involving 170,000 arrests for sex offenses in New York between 1986 and 2006 revealed that over 94 percent were first-time offenders.[2] Of all people

---

[1] 5 Percent of Sex Offenders Rearrested For Another Sex Crime Within 3 Years of Prison Release, *available at* https://www.bjs.gov/content/pub/press/rsorp94pr.cfm.

[2] Jeffrey C. Sandler et al., *Does a Watched Pot Boil? A Time Series Analysis of New York State's Sex Offender Registration and Notification Law*, Psychology, Public Policy and Law (Nov. 2008).

convicted of offenses, people convicted of sex offenses are among the least likely to be rearrested for committing the same offense.[3]

### DOCCS's Policy and Practice of Banning Internet Access for All Registrants.

31.  DOCCS imposes a special condition banning internet access on *all* Registrants on community supervision through its Directive 9202: "Management of Sex Offender Use of Computer Related Materials and Electronic Devices."

32.  The condition imposed by Directive 9202 (referred to in the Directive as GES SC 40 A-F) provides that an individual under community supervision "not own, possess, purchase or have control of any computer, computer related material, electronic storage devices, communication devices and/or the internet unless [they] obtain written permission from [their] Parole Officer."

33.  The complete internet ban is imposed on "any registered sex offender in its entirety before release" without any consideration of whether the individual has a history of abusing the internet. This means that all Registrants are banned from accessing the internet from the moment they are released from confinement.

34.  Under Directive 9202, Registrants proactively must obtain written permission from their parole officer if they seek to use the internet. The Registrant's parole officer then must obtain approval from their supervising parole officer.

35.  Although Directive 9202 includes a list of 12 factors for the parole officer to consider, the list is non-exhaustive and parole officers may consider any factor they deem relevant in determining whether to allow internet access. The factors are also vague, and provide no guidance on when an individual must be permitted to use the internet for a legitimate purpose. For example, parole officers can consider "confirmed or suspected behavior while on supervision" and any "other

---

[3] BJS Fuels Myths about Sex Offense Recidivism, Contradicting its Own New Data, *available at* https://www.prisonpolicy.org/blog/2019/06/06/sexoffenses/.

relevant case specific factors." Further, the factors also fail to give guidance to parole officers on how much internet activity to allow if they decide to grant an exception. Instead, parole officers have unconstrained and unfettered discretion to prohibit Registrants from using large swaths of the internet.

36. Directive 9202 also fails to set forth a time frame in which a parole officer must consider and decide on a Registrant's request for internet access and does not require that the reasons for denying access be in writing.

37. Directive 9202 does not provide any information about how someone under community supervision can challenge a refusal to permit internet access.

38. Upon information and belief, per Directive 9202, DOCCS overwhelmingly denies Registrants' requests for internet access and does not allow Registrants to utilize the internet for legitimate First Amendment purposes.

39. Even in the rare circumstances where DOCCS grants an exemption to the internet ban, these exemptions are narrow and prohibit significant legitimate activity. For example, at least one Registrant was told that he could go to a particular library during specific times to use a computer to search for housing but was not allowed any other computer or internet use.

40. Further, these narrow exemptions to the internet ban are often made orally and not memorialized in writing, creating confusion and fear for Registrants who aim to comply with their parole conditions.

### e-STOP and DOCCS' Bans on Social Media

41. In 2008, the New York State Legislature enacted e-STOP, which: (1) requires people on the registry to register their internet accounts and identifiers with the state Division of Criminal Justice Services' ("DCJS") New York State Sex Offender Registry; (2) authorizes DCJS to release all internet identifiers to social networking websites in order to prohibit registrants from accessing

9

those websites; and (3) requires the Board of Parole to impose mandatory conditions prohibiting certain Registrants from accessing "commercial social networking websites." N.Y. Exec. Law § 259-c(15). This action challenges only the third provision barring access to commercial social networking websites.

42. A "commercial social networking website" is defined as a website that offers access to people under eighteen years of age and permits users to: (1) create a public or user-accessible webpage or profile about themselves; (2) interact with other users over the age of eighteen; and (3) engage in direct or real time communication with other users.

43. e-STOP's ban applies to the biggest social media platforms that people use to communicate, including Facebook, Twitter, LinkedIn, and Instagram.

44. e-STOP's definition of a "commercial social networking website" also covers a large number of websites not typically considered social media. For example, the New York Times' website allows United States users ages thirteen and older to create accounts and comment on news articles in real-time.

45. e-STOP mandates that the special condition barring access to commercial social networking websites applies, without exception, to any Registrant on community supervision: (1) deemed a Level Three sex offender; or (2) who committed an underlying offense involving a minor; or (3) who used the internet to facilitate the underlying offense. The statute does not provide for any individualized assessment of whether a blanket ban on social media access is appropriate.

46. DOCCS Directive 9201 is an administrative policy promulgated by DOCCS for the purpose of implementing e-STOP's social media ban. Directive 9201 requires that DOCCS impose the social media ban on the three categories of people subject to the e-STOP statute. In accordance with e-STOP, Directive 9201 requires DOCCS to impose the social media ban on Registrants without first conducting an individualized assessment of whether it is reasonable or necessary.

47. The special condition imposed pursuant to Directive 9201 provides that the Registrant "will not use the internet to . . . access a commercial social networking site" and includes the definition of "commercial social networking site" used in e-STOP. DOCCS applies the ban to Registrants under community supervision who fall within all three categories of people specified in the statute.

48. DOCCS also imposes the social media ban condition on Registrants not covered by e-STOP. For example, DOCCS imposes the social media ban on Level One Registrants without offenses against children and who did not use the internet to offend. Upon information and belief, DOCCS imposes this condition on all Registrants under community supervision.

### Restrictions on Plaintiffs' Social Media and Internet Access

### Vernon Jones

49. Vernon Jones is a 55-year-old resident of Brooklyn, New York. Mr. Jones is the father of two sons and is currently unemployed. He is currently serving a term of post-release supervision and will remain under supervision until February 16, 2022. His release conditions bar him from accessing social media and the internet.

50. In 2006, Mr. Jones was convicted of attempted rape in the first degree. He had previously been convicted of rape in 1993. For the 2006 offense, Mr. Jones received a sentence of 13 years' imprisonment and 5 years of post-release supervision. Both of his convictions did not involve minors and the internet was not used to facilitate the crimes.

51. Upon release from prison in 2017, Mr. Jones was designated a risk Level Three. He is currently enrolled in a sex offender treatment program.

52. As a Level Three, e-STOP's social media ban was imposed upon Mr. Jones as a release condition, even though he has never committed a crime involving a computer, the internet,

or social media. Additionally, in accordance with its practice of prohibiting internet access for Registrants, DOCCS imposed a ban on internet access.

53. The social media and internet bans infringe Mr. Jones's right to free speech and restrict his ability to participate in politics. Mr. Jones works with a local community-based organization to advocate for the rights of homeless individuals. He participates in meetings concerning affordable housing and attends leadership classes on advocacy strategy and local government. As a result of the social media and the internet bans, his ability to follow the work of the organization and participate in their advocacy efforts is severely limited. He cannot follow their activities on Facebook, Twitter, or other popular social media platforms. Moreover, the social media and internet bans create barriers to accessing news that is relevant to his advocacy efforts, as well as other political interests.

54. Mr. Jones is a devout Muslim who is actively involved in religious discourse and volunteer work to support his local Islamic community. He is currently unable to use the internet and social media platforms to discuss his faith, find and attend local mosques, or connect with others who seek to build a support network that provides religious-based care packages for Muslims in local hospitals.

55. Further, Mr. Jones struggles to pursue higher education due to the bans on social media and internet access. Mr. Jones has completed 31 credits towards a Bachelors of Arts degree, however, he cannot use the internet to pursue his education online.

56. In addition, the internet and social media bans have hindered his ability to pursue employment opportunities. For example, he has gone to apply for jobs in person and been required to complete an on-line application, which he is not permitted to access.

**Vladimir Krull**

57. Vladimir Krull is a 42-year-old resident of Yonkers, NY. From 1996 to 1999, Mr. Krull was employed as a computer technician for the NYC Board of Education. Afterwards, he served in the United States Marine Corps until 2004, when he received an honorable discharge. Mr. Krull then joined the New York City Police Department where he rose to the rank of sergeant. While on the police force, Mr. Krull received his BA from John Jay College of Criminal Justice. His term of post-release supervision will end in 2025. His original release conditions barred him from accessing social media and the internet.

58. In 2017, Mr. Krull was convicted of committing a criminal sexual act in the second degree and second-degree rape. While this offense involved a minor, it was never alleged that the internet was used in the commission of the crime. He was sentenced to three years' imprisonment and five years of post-release supervision. His conviction is still on appeal. Mr. Krull is adjudicated a risk Level Two.

59. Because the convicted offense involved a minor, e-STOP's social media ban was imposed upon Mr. Krull as a release condition, even though he has never committed a crime involving a computer, the internet, or social media. Additionally, in accordance with its practice of prohibiting internet access for Registrants, DOCCS imposed a ban on internet access.

60. Shortly after being released Mr. Krull requested internet access so that he could buy medical supplies for his ailing father. After not receiving a response, Mr. Krull made several subsequent requests for internet access until his finally his parole officer met with her supervisor out of the presence of Mr. Krull. Upon returning, she granted him limited internet access to order medical supplies for his father, do legal research, and use email, only after she has confirmed that he has bought and installed an internet monitoring software on his computer. This decision was made orally and she provided no reasons for why she, or her supervisor, allowed him this limited internet

13

access. Mr. Krull bought and installed the required software, but as of the date of filing, she has not confirmed the software, and thus he is still banned from using the internet.

61. The restrictions placed on Mr. Krull are having a severe impact on his life. Mr. Krull is the sole caretaker of his wheelchair-bound, diabetic father. His father recently had several strokes, and the internet and social media restrictions has made it harder for Mr. Krull to do simple caretaking tasks for his father. Further, because Mr. Krull is his father's only caretaker, and can no longer work in the police department, he needs a job that will allow him to work from home. Given that he has experience with information technology, he would like to go back into that field, however the internet and social media restrictions make this impossible.

62. Further, Mr. Krull is unable to engage with his Easter Orthodox Christian religion online and stay politically active. Prior to arrest, Mr. Krull's love of scuba diving led him to be involved in environmental causes. He used social media to help with beach clean-ups and discussed environmental issues online. Mr. Krull also used social media to seek out veteran support groups and advocate for those who served in the military. As part of his advocacy work, the ability to contact politicians directly and stream governmental meetings was very important to him. With the social media and internet restrictions, Mr. Krull is unable to engage meaningfully in political advocacy about the issues he cares most about.

### Thomas Mitchell

63. Thomas Mitchell is a 55-year-old resident of Brooklyn, NY. Mr. Mitchell has a large family consisting of his fiancée, several children, and many grandchildren. Mr. Mitchell is serving a term of post-release supervision until 2028. His release conditions bar him from accessing social media and the internet.

64. In 2011, Mr. Mitchell pled guilty to course of sexual conduct against a child in the first degree. The internet was not utilized to commit the offense. Mr. Mitchell had no prior

convictions for sex offenses. He was sentenced to a term of seven years' imprisonment and ten years of post-release supervision.

65. While in prison, Mr. Mitchell completed sex offender treatment and counseling. He was released in 2018 and has continued to go to counseling. He recently graduated from one of his treatment programs. Mr. Mitchell is a risk Level Two.

66. Because the convicted offense involved a minor, e-STOP's social media ban was imposed upon Mr. Mitchell as a release condition, even though he has never committed a crime involving a computer, the internet, or social media. Additionally, in accordance with its practice of prohibiting internet access for Registrants, DOCCS imposed a ban on internet access.

67. The internet and social media bans have severely burdened Mr. Mitchell's ability to reintegrate into society. Recently, on a home visit, Mr. Mitchell's parole officer confiscated his cellphone because it had internet capabilities. Mr. Mitchell's previous parole officer orally gave him permission to have an internet-capable cellphone, nonetheless his current parole officer still confiscated the phone and ordered him to buy a less advanced one. Ever since this incident, Mr. Mitchell has been phoneless.

68. Additionally, given that Mr. Mitchell has to comply with New York's onerous housing restrictions for certain Registrants, finding compliant housing without using the internet has been extremely difficult for him. He has also struggled to look up treatment facilities and figure out how to get back and forth to these locations.

69. Mr. Mitchell is also distressed by the isolation from his family members. Since people now share the most important moments of their lives on social media, Mr. Mitchell often misses these special occasions. For example, he cannot view images of his grandchild's birth because they are posted on Facebook.

15

**Compton Mohabir**

70. Compton Mohabir is a 42-year-old chef who resides in Queens, NY. Mr. Mohabir immigrated to New York from Guyana when he was six years old with his mother and brother. He later joined the United States Naval Reserve for four years before receiving a general discharge. After leaving the military, Mr. Mohabir trained to become a chef and worked as an executive chef before he was incarcerated. Mr. Mohabir is currently under post-release supervision until 2024. His release conditions bar him from accessing social media and the internet.

71. In 2011, Mr. Mohabir was convicted of sexual abuse in the first degree. He had no prior sex offenses and this offense did not involve a minor. The offense also did not involve the internet or social media. Mr. Mohabir was sentenced to seven years' imprisonment and five years of post-release supervision.

72. While incarcerated, Mr. Mohabir completed 13 months of sex offender treatment. In June 2019, Mr. Mohabir was released and is currently serving a term of post-release supervision. Upon release, Mr. Mohabir was adjudicated a risk Level One. He continues to attend treatment.

73. Despite the fact that he is designated a Level One and his crime did not involve the internet or a minor, Mr. Mohabir has been subjected to the social media ban. Additionally, in accordance with its practice of prohibiting internet access for Registrants, DOCCS imposed a ban on internet access.

74. The conditions severely burden Mr. Mohabir's ability to reintegrate into society. Mr. Mohabir has family in other states that he cannot communicate with easily due to the social media and internet bans. Additionally, he struggles to pursue his trained profession as a chef. He cannot post his resume online, nor can he continue his food blog where he used to display the skills that he acquired in culinary school.

**Corydon Umber**

75. Corydon "Cory" Umber is a 51-year-old-man who resides in Pottersville, NY. Mr. Umber is employed in the restaurant industry. He has three children and several grandchildren. Mr. Umber is currently released on parole. His release conditions bar him from accessing social media and the internet.

76. In 1996, Mr. Umber was convicted of third-degree rape involving a minor. He was released from prison in 1997. Later that year he was convicted of assault in the third degree and rape in the first degree for an incident involving his then 32-year-old girlfriend. Neither of these offenses utilized the internet. He received a maximum sentence of 25 years' imprisonment and was released on parole in 2018. Prior to being released Mr. Umber received his GED and completed sex offender treatment. Mr. Umber is adjudicated a risk Level Three.

77. Given that Mr. Umber is a risk Level Three, the social media ban has been imposed as a condition of Mr. Umber's parole. In accordance with its practice of prohibiting internet access for Registrants, DOCCS imposed a ban on internet access on Mr. Umber.

78. Mr. Umber has sought permission to use the internet by making verbal requests to his parole officer on several occasions. His parole officer has immediately denied these requests without providing any substantive justification or rationale.

79. Given that Mr. Umber served most of the last two decades in prison, he has limited knowledge of how to use the internet. However, because he is now banned from having internet access, he is unable to become digitally literate, making it difficult for Mr. Umber to apply for jobs and reintegrate into a technology-dependent society. He has had difficulty maintaining his personal finances, because he cannot bank online and his bank charges for paper documents. And he has a hard time accessing information about his healthcare and governmental benefits, many of which use online portals to access services.

## JURISDICTION AND VENUE

80. Plaintiffs bring this action to enforce the First Amendment to the United States Constitution. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 because this lawsuit alleges violations of the U.S. Constitution and raises questions of federal law. Jurisdiction is also based upon 28 U.S.C. § 1343(3) because the lawsuit seeks relief for the deprivation of Plaintiffs' constitutional rights under color of state law.

81. Defendants are public officials of the State of New York. Defendants perform official duties within the State of New York. This Court, accordingly, has personal jurisdiction over Defendants. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and § 1391(c)(2). Defendants, who have statewide authority, perform their official duties in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims have occurred or will occur in this District.

## LEGAL CLAIMS

**Count One: DOCCS Directive 9202 Banning Internet Access is Unconstitutional.**

82. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

83. The ban on internet access imposed on Registrants pursuant to DOCCS Directive 9202 violates the First Amendment to the United States Constitution and 42 U.S.C. § 1983.

**Count Two: e-STOP's Social Media Ban is Unconstitutional.**

84. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

85. The ban on social media use imposed by e-STOP violates the First Amendment to the United States Constitution and 42 U.S.C. § 1983.

### Count Three: DOCCS Directive 9201's Social Media Ban is Unconstitutional.

86. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

87. The ban on social media use imposed on Registrants by DOCCS Directive 9201 violates the First Amendment to the United States Constitution and 42 U.S.C. § 1983.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Honorable Court:

1. Accept jurisdiction over this case;

2. Declare that the internet ban in DOCCS Directive No. 9202 is unconstitutional and violates the First Amendment of the United States Constitution;

3. Declare that N.Y. Exec. Law § 259-c(15)'s ban on social media is unconstitutional and violates the First Amendment of the United States Constitution;

4. Declare that social media ban in DOCCS Directive No. 9201 is unconstitutional and violates the First Amendment of the United States Constitution;

5. Enjoin the defendants from enforcing the unconstitutional DOCCS Directive 9202, which bans internet access;

6. Enjoin the defendants from enforcing the unconstitutional provisions of e-STOP, N.Y. Exec. Law § 259-c(15), which imposes a ban on social media websites;

7. Enjoin the defendants from enforcing the unconstitutional DOCCS Directive 9201, which imposes a ban social media websites;

8. Award the plaintiffs' attorneys costs and fees incurred in this action pursuant to 42 U.S.C. § 1988 and other applicable authority; and

9. Enter judgment in the plaintiffs' favor; and

10. Grant such other and further relief that the Court deems just and proper.

19

Dated: June 1, 2020

                                Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION FOUNDATION

By:    */s/ Molly K. Biklen*
       MOLLY K. BIKLEN
       DANIEL R. LAMBRIGHT*
       125 Broad Street, 19th Floor
       New York, New York 10004
       212-607-3300
       mbiklen@nyclu.org
       dlambright@nyclu.org

RUTGERS CONSTITUTIONAL RIGHTS CLINIC

By:    */s/ Alexis Karteron*
       ALEXIS KARTERON
       Center for Law & Justice
       123 Washington Street
       Newark, NJ 07102
       973-353-3239
       alexis.karteron@law.rutgers.edu

PRISONERS LEGAL SERVICES OF NY

By:    */s/ Michael E. Cassidy*
       MICHAEL E. CASSIDY
       JAMES BOGIN**
       KAREN L. MURTAGH
       41 State Street, Suite M112
       Albany, NY 12207
       mcassidy@plsny.org
       jbogin@plsny.org
       kmurtagh@plsny.org

*Application for admission pending
**pro hac vice application forthcoming