UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
VERNON JONES, VLADIMIR KRULL,
THOMAS MITCHELL, COMPTON MOHABIR,
and CORYDON UMBER,

                              Plaintiffs,


            -against-                                                    **MEMORANDUM & ORDER**

                                                                         Case No: 20-cv-1332
TINA M. STANFORD, Esq., in her official
capacity as Chairwoman of the New York Board
of Parole and ANTHONY ANNUCCI, in his
official capacity as Acting Commissioner of the
Department of Corrections and Community
Supervision,

                              Defendants.
---------------------------------------------------------------X
DEARIE, District Judge

           Plaintiffs, sexual offender registrants ("Registrants") on community supervision, seek to

preliminarily enjoin New York's Electronic Security Targeting of Online Predators Act ("e-

STOP"), and New York State Department of Corrections and Community Supervision

("DOCCS") Directive 9201 on the basis that prohibitions on social media access by certain

categories of Registrants on community supervision violate the First Amendment. While the

Court appreciates the State's compelling interest and laudable efforts to protect children from sex

offender recidivists on the internet, New York's attempt to advance this interest via blanket

restrictions cannot be squared with the significant freedom of speech rights at stake. For the

following reasons, Plaintiffs' motion for a preliminary injunction is GRANTED. While parole

officers remain free to impose individualized restrictions on supervisees based on the

Registrant's specific circumstances and risk of recidivating using social media, e-STOP and

Directive 9201 are preliminarily enjoined so far as they apply wholesale to Registrants who have

not used the internet to facilitate the commission of their underlying sex offense.

## FACTUAL BACKGROUND

Individuals convicted of certain statutorily enumerated sex offenses are required to register as sex offenders under New York's Sex Offender Registration Act ("SORA") prior to parole or post-release supervision (collectively, "community supervision"). Amended Complaint ("Compl."), ECF No. 17, ¶¶ 23, 25. SORA's registration requirement applies to those convicted of an array of misdemeanor and felony sex offenses, from marrying an adult relative to serious felonies. Id. ¶ 25. As part of the registration process, the sentencing court holds a hearing to assess a risk level that is based on the individual's risk of recidivism. Id. ¶ 26. Risk levels range from one (low risk) to three (high risk) and vary in their corresponding restrictions and registration requirements. Id. ¶¶ 26-27.

In addition to being subject to general conditions of release that apply to all individuals on community supervision, Registrants may be subject to special conditions imposed by the Parole Board and DOCCS. Id. ¶ 24. New York's e-STOP law requires that the Board of Parole impose a mandatory condition of release prohibiting three categories of Registrants from accessing "commercial social networking websites." Id. ¶ 41 (quoting N.Y. Exec. L. § 259-c(15)). The restriction applies to Registrants on community supervision where: (1) "the victim of [the Registrant's] offense was under the age of eighteen at the time"; or (2) the Registrant "has been designated a level three sex offender"; or (3) "the internet was used to facilitate the commission of the crime." N.Y. Exec. L. § 259-c(15). e-STOP defines "commercial social networking websites" as:

> a website that permits persons under eighteen years of age to be registered users for the purpose of establishing personal relationships with other users, where such persons under eighteen years of age may: (i) create web pages or profiles that provide information about themselves where such web pages or profiles are available to the public or to other users; (ii) engage in direct or real time communication with other users, such as a chat room or instant messenger; and (iii)

communicate with persons over eighteen years of age;  provided, however, that, for purposes of this subdivision, a commercial social networking website shall not include a website that permits users to engage in such other activities as are not enumerated herein.

Id. Plaintiffs claim that this definition applies to "traditional" social media, such as Twitter and Facebook, as well as broadly to sites like the New York Times website. Compl. ¶¶ 43-44.

DOCCS Directive 9201 was promulgated to implement e-STOP. Id. ¶ 46. It adopts the same definition of "commercial social networking websites" and applies the Ban[1] as a special condition of release on the same three categories of Registrants as enumerated in the statute, without exception. Id. ¶¶ 46-47; Biklen Decl., ECF No. 28-2, Ex. 1.

Plaintiffs are registered sex offenders on community supervision. Compl. ¶ 6. Their underlying crimes range from engaging in sexual conduct against minors, including rape, to repeated rape or attempted rape convictions. Id. ¶¶ 50, 58, 64, 76. None has used the internet to facilitate a sex offense, but all are banned from accessing social media under e-STOP and Directive 9201 as Level Three offenders or perpetrators of a sex crime against a minor.[2] Id. ¶¶ 6, 52, 59, 66, 77. Bringing facial and as applied challenges, Plaintiffs allege that the Ban unconstitutionally infringes on protected speech, such as by restricting them from using social media to: participate in online religious classes, view religious and educational lectures on YouTube, engage in political advocacy work, search for employment or housing, communicate with distant family members, hone skills via YouTube videos, and acquire information about

---

[1] The commercial social networking restrictions imposed by e-STOP and Directive 9201 are collectively referred to as the "Ban."

[2] Defendants concede that the Ban was misapplied to Plaintiff Compton Mohabir as he does not fit within the statutory criteria. The Ban was revoked as to Mr. Mohabir in June 2020, Osouna Decl., ECF No. 32, ¶ 6, and the parties agree that his as applied challenge to e-STOP and Directive 9201 is now moot.

current events. See Jones Decl., ECF No. 28-3, ¶¶ 9-13; Krull Decl., ECF No. 28-4, ¶¶ 13-20;

Mitchell Decl., ECF No. 28-5, ¶¶ 9-11; Umber Decl., ECF No. 28-7, ¶¶ 11-14.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter

v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (citation omitted). "A party seeking a

preliminary injunction must ordinarily establish (1) irreparable harm; (2) either (a) a likelihood

of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to

make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of

the moving party; and (3) that a preliminary injunction is in the public interest." New York ex

rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015) (quotations and citations

omitted). But when "the moving party seeks to stay government action taken in the public

interest pursuant to a statutory or regulatory scheme," he must establish "irreparable injury [and]

a likelihood that he will succeed on the merits of his claim." Able v. United States, 44 F.3d 128,

131 (2d Cir. 1995) (citation omitted). For "a mandatory injunction that alters the status quo," the

likelihood of success on the merits must be "clear or substantial." D.D. ex rel. V.D. v. New York

City Bd. of Educ., 465 F.3d 503, 510 (2d Cir. 2006), opinion amended on denial of reh'g, 480

F.3d 138 (2d Cir. 2007) (quotations and citations omitted).

## ANALYSIS

I. **Plaintiffs Make a Clear and Substantial Showing that They are Likely to Succeed on the Merits**

Plaintiffs' likelihood of success on the merits turns on whether the Ban "burden[s]

substantially more speech than is necessary to further the government's legitimate interests" in

protecting children. Packingham v. North Carolina, 137 S. Ct. 1730, 1736 (2017) (citation

omitted). Because e-STOP and Directive 9201 are not narrowly tailored as to the subset of

Registrants to whom they apply nor to the websites proscribed, Plaintiffs sufficiently demonstrate that they are likely to succeed on their claim that the Ban is unconstitutional.

      A.  <u>Legal Framework</u>

In <u>Packingham</u>, the Supreme Court struck down a state law that prohibited all registered sex offenders, including those no longer subject to supervision, from accessing commercial social networking websites. <u>Id.</u> 1733-34, 1738. Assuming that the ban only applied "to social networking sites as commonly understood—that is, websites like Facebook, LinkedIn, and Twitter" and that the ban was content neutral, the Court determined that it could not withstand intermediate scrutiny. <u>Id.</u> at 1736-37 (quotations omitted); <u>see id.</u> at 1736 ("In order to survive intermediate scrutiny, a law must be 'narrowly tailored to serve a significant governmental interest.' In other words, the law must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'") (quoting <u>McCullen v. Coakley</u>, 573 U.S. 464, 486 (2014)). <u>Packingham</u> recognized both North Carolina's interest in "keeping convicted sex offenders away from vulnerable victims" and that social media has become one of the "most important places (in a spatial sense) for the exchange of views." <u>Id.</u> at 1735, 1737. It concluded that "[t]he State has not . . . met its burden to show that th[e] sweeping law is necessary or legitimate to serve [its] purpose" where "to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." <u>Id.</u> at 1737. The statute improperly "suppress[ed] lawful speech as the means to suppress unlawful speech." <u>Id.</u> at 1738 (quoting <u>Ashcroft v. Free Speech Coalition</u>, 535 U.S. 234, 255 (2002)).

Since <u>Packingham</u>, Courts within the Second Circuit have weighed in on the constitutionality of internet restrictions in as applied challenges by individuals on supervision. In <u>United States v. Eaglin</u>, the Second Circuit struck down a wholesale internet ban imposed as a

condition of supervised release on a defendant who had sexual relationships with two thirteen-year-old girls. 913 F.3d 88, 91, 95-96 (2d Cir. 2019). While the Court did not entirely base its decision on Packingham, it emphasized the case's relevance to conditions of supervised release:

> The restriction that Eaglin challenges here, in contrast [to that in Packingham], was imposed as a condition of supervised release that applies to Eaglin alone and for a limited albeit lengthy duration. Certain severe restrictions may be unconstitutional when cast as a broadly-applicable criminal prohibition, but permissible when imposed on an individual as a condition of supervised release. In our view, Packingham nevertheless establishes that, in modern society, citizens have a First Amendment right to access the Internet. The substance of the Internet ban imposed on Eaglin is even broader in its terms, if not in its application, than that struck down in Packingham. . . . It therefore implicates the same First Amendment concerns that were at issue in Packingham: Eaglin has a First Amendment right to be able to email, blog, and discuss the issues of the day on the Internet while he is on supervised release.

Id. at 95-96 (citation omitted). Eaglin concluded that "[i]n light of our precedent, and as emphasized by Packingham's recognition of a First Amendment right to access certain social networking websites, the imposition of a total Internet ban as a condition of supervised release inflicts a severe deprivation of liberty." Id. at 97.

In Yunus v. Robinson, Judge Nathan adopted a Report and Recommendation preliminarily enjoining a special condition of parole that "prohibit[ed plaintiff] categorically from accessing a commercial social networking website." Case No. 17-cv-5839 (AJN), 2019 WL 168544, at *15 (S.D.N.Y. Jan. 11, 2019) (quotations omitted). Yunus reasoned that "while in some contexts parolees receive a lesser degree of constitutional protection," "[u]nder Packingham, blanket limitations on an individual's ability to access social media will receive intermediate scrutiny, even when imposed as conditions of parole." Id. at *16. Because the Registrant's underlying crime—kidnapping a minor—"did not involve the internet, social media, the exchange of electronic messages, cell phones, or computers[, a]s applied to Plaintiff," the

special condition "burden[ed] substantially more speech than necessary and therefore fail[ed]
intermediate scrutiny." Id. at 1, 17.

> B.  The Ban is Not Narrowly Tailored in its Application to Registrants

Plaintiffs argue that the Ban is not narrowly tailored because it applies to Registrants who
do not present a significant risk of recidivating via social media. Neither e-STOP nor Directive
9201 provides a mechanism to conduct an individualized assessment as to whether a Registrant
poses a risk of misusing social media before imposing the Ban. Instead, they apply to all Level
Three Registrants and Registrants convicted of a crime against a minor, even where the
underlying offense did not involve the internet.

Defendants assert that the Ban is narrowly tailored as it only applies as a temporary
condition of release to a subset of especially dangerous Registrants. They argue that Level Three
Registrants have already undergone "a detailed individualized risk determination by the Board of
Examiners of Sex Offenders" that is "subject to review by the sentencing court after a hearing
process." Opp., ECF No. 34, at 15 n.9. And, Defendants claim, while Plaintiffs' crimes may not
have involved the internet, that is of little relevance where most of their criminal histories
predate social media's ubiquity. Defendants emphasize their substantial interest in protecting
vulnerable children from recidivist sex offenders on the internet, contending that absent the Ban,
their "interest would be served less well." Id. at 12-13 (citing Ward v. Rock Against Racism, 491
U.S. 781, 800 (1989)).

Defendants claim that the Ban allows for "ample alternative" means of accessing
information and commerce. Id. at 15. See also Ward, 491 U.S. at 791 ("[T]he government may
impose reasonable restrictions on the time, place, or manner of protected speech, provided the
restrictions are justified without reference to the content of the regulated speech, that they are

narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.") (quotations and citations omitted). Defendants note that e-STOP and Directive 9201 do not prevent individual parole officers from permitting Registrants access to websites that fall outside the Ban's scope,[3] and that news websites, television broadcasts, campaign websites, and Amazon.com provide other means to exercise First Amendment rights.

i.  *Packingham*'s *Framework Applies to the Ban*

Without disputing that Packingham "sets forth the framework for analyzing the constitutionality of the application of the e-STOP restrictions to the Plaintiffs," Defendants suggest that the case is inapplicable to those on community supervision. Opp. at 10-11. While Packingham expressed in dicta that "[i]t is unsettling to suggest that only a limited set of websites can be used even by persons who have completed their sentences," it explicitly did not base its decision on the fact that the North Carolina law applied to persons who completed their term of supervision: "the troubling fact that the law imposes severe restrictions on persons who already have served their sentence and are no longer subject to the supervision of the criminal justice system is . . . *not* an issue before the Court." 137 S. Ct. at 1737 (emphasis added). See also United States v. Browder, 866 F.3d 504, 511 n.26 (2d Cir. 2017) (observing that Packingham "not[ed], but seem[ed] not to rely on" that the social media ban applied to those no longer on supervision); Yunus, 2019 WL 168544, at *16 ("There is no indication in Packingham that parolees are exempted from the Court's decision. . . . [T]he Court was clear that the

---

[3] In addition to e-STOP and Directive 9201, DOCCS Directive 9202 imposes a special condition of release banning internet access for all Registrants on community supervision unless they obtain written permission from their parole officer. Compl. ¶¶ 31-34. Due to COVID-19, Plaintiffs have been granted some temporary relief from the wholesale internet ban, Biklen Decl. ¶¶ 3-4, and Directive 9202 is not at issue in the current motion.

distinction between those who were presently under the supervision of the criminal justice system and those who no longer were was not a basis for its holding[.]"). And any ambiguity about the scope of <u>Packingham</u> is further foreclosed by the Second Circuit's reliance on <u>Packingham</u> in <u>Eaglin</u>: "The government argues that Eaglin [a defendant on supervised release] has no constitutional right to access the Internet. We reject that position as outdated and in conflict with recent Supreme Court precedent. The Supreme Court forcefully identified such a right in <u>Packingham</u> . . . ." 913 F.3d at 95 (citations omitted).[4]

> ii. *The Ban on Registrants is Unlikely to Survive Intermediate Scrutiny*

The Ban is "not narrowly tailored to target those offenders who pose a factually based risk to children through the use or threatened use of the banned sites or services." <u>Doe v. Nebraska</u>, 898 F. Supp. 2d 1086, 1111 (D. Neb. 2012). Defendants proffer only speculative assertions as to why the Ban advances its undoubtedly substantial interest in protecting children from internet-facilitated sex crimes. They focus on the heinous nature of Plaintiffs' crimes, but offer no evidence that Plaintiffs, nor other Registrants on community supervision who committed crimes against minors or are Level Three offenders, pose a particular threat of internet-based recidivism. See <u>Turner Broad. Sys., Inc. v. F.C.C.</u>, 512 U.S. 622, 664 (1994) ("That the

---

[4] Defendants cite <u>United States v. Savastio</u> in support of their claim. In a non-precedential opinion, the Second Circuit deemed <u>Packingham</u> "inapposite" to its review of a probationer's internet monitoring condition because <u>Packingham</u> delt with restrictions on people "no longer subject to the supervision of the criminal justice system" and because the monitoring condition at issue did not amount to "an outright ban on Savastio's access to all forms of social media." 777 F. App'x 4, 7 (2d Cir. 2019). <u>Savastio</u> also determined that it was not bound by <u>Eaglin</u>, because <u>Eaglin</u> "rejected special conditions that altogether prohibited the defendant from accessing the Internet without the specific approval of his probation officer." <u>Id.</u> at 6-7 (citations omitted). But unlike <u>Savastio</u>, the Ban here is akin to the type of blanket restrictions found in <u>Eaglin</u> and <u>Packingham</u>. Thus, <u>Eaglin</u>'s clear proscription governs: a Registrant "has a First Amendment right to be able to email, blog, and discuss the issues of the day on the Internet while he is on supervised release." <u>Eaglin</u>, 913 F.3d at 96.

Government's asserted interests are important in the abstract does not mean, however, that the [statute] will in fact advance those interests. . . . [I]t must do more than simply posit the existence of the disease sought to be cured.") (quotations and citation omitted). The risk level assessment is based on an individualized analysis that considers the likelihood of recidivism, but the risk of recidivism via the internet is not specifically contemplated or necessarily even addressed; multiple Plaintiffs state that they "were not questioned about the internet or social media at their SORA hearings or before the social media ban was imposed." Pl. Mem., ECF No. 28-1, at 22 (citing Jones Decl. ¶ 5; Mohabir Decl., ECF No. 28-6, ¶ 5; Umber Decl. ¶ 7). And while unlike in Packingham the Ban only applies to Registrants for their term of supervision, such limitation does not mitigate the First Amendment burden where the restrictions can last up to twenty-five years. See Reply, ECF No. 35, at 6 (citing N.Y. Penal Law § 70.45(2-a)(i)). While "the First Amendment rights of parolees [may be] circumscribed," Farrell v. Burke, 449 F.3d 470, 497 (2d Cir. 2006), they may not be disregarded, see Eaglin, 913 F.3d at 95-96.

Applying intermediate scrutiny to each Plaintiff's case demonstrates why New York's one-size-fits-all Ban is insufficiently tailored to satisfy constitutional demands. As an initial matter, Defendants' claim that Plaintiffs were convicted prior to having the opportunity to offend using the internet is dubious at least as to Mr. Jones (convicted in 2006), Mr. Mitchell (convicted in 2011), and Mr. Krull (convicted in 2017). See Reply at 7 n.3; Reno v. Am. Civil Liberties Union, 521 U.S. 844, 870 (1997) (recognizing in 1997 that "the Internet can hardly be considered a 'scarce' expressive commodity"); Nebraska, 898 F. Supp. 2d at 1109 ("By the end of 2008 and the start of 2009, social networking became even more popular than e-mail.") (citation omitted).

As to Plaintiff Vladimir Krull, he was sentenced in 2017 to three years imprisonment and five years supervision on charges stemming from repeated sexual contact, including rape, of his then-girlfriend's minor daughter. Cox Decl., ECF No. 33, ¶¶ 3-4. Mr. Krull was assessed as a Level Two sex offender. Id. ¶ 3. The record is devoid of evidence that Mr. Krull has or will use the internet to recidivate. Indeed, the facts just as readily support the opposite conclusion: social media was ubiquitous at the time of his conviction, Mr. Krull has never been accused of improper internet use, and the facts of his offense suggest that it was a crime of opportunity.

Plaintiff Thomas Mitchell is a Level Two registrant sentenced to eleven years imprisonment and ten years supervision for "having sexual intercourse with his stepdaughter beginning in 1990, when she was 7 years old, and continuing until the victim was 17." Domenech Decl., ECF No. 31, ¶¶ 3, 5. Mr. Mitchell impregnated the victim when she was fifteen, paid her for sex, and impregnated her again when she was nineteen. Id. ¶ 5. His parole officer states:

> In my opinion, Mr. Mitchell is properly barred from accessing websites where an untold number of children migrate. Under any circumstances, I would be concerned that allowing Mr. Mitchell access to those websites would enable him to access/trade child pornography and entice children (including family members) through private/direct messaging. Mr. Mitchell would also have the means of locating/messaging the female victim of his crime of conviction, a then minor whom he sexually abused and impregnated. . . . Therefore, I feel it appropriate to deny Mr. Mitchell access to Facebook and other social media outlets, where children convene, particularly since several of these websites have location settings that allow viewers to see where social media users are in real time.

Id. ¶¶ 11-12. However, Defendants provide nothing to support that Mr. Mitchell's conviction extended beyond a crime of opportunity and that he has or will contact minors via the internet.[5]

---

[5] Mr. Mitchell's parole officer states: "I believe that Mr. Mitchell had previously accessed the internet, and perhaps social media, without my permission since on February 27, 2020, I confiscated a smartphone that he was not permitted to possess. I returned the smartphone in

Plaintiff Corydon Umber is a Level Three sex offender with a lengthy criminal history. Geh Decl., ECF No. 29, ¶¶ 3-5. His sex crimes entail a 1995 rape of a fourteen-year-old girl and a 1997 rape and assault of an adult woman via forcible compulsion. Id. ¶¶ 4-5. He was sentenced to twenty-five years imprisonment on the latter offense and released in December 2018. Id. ¶¶ 5-6. He is on parole until July 2022. Id. ¶ 3. Mr. Umber's parole officer states: "It is my profound feeling that [allowing Mr. Umber access to social media and dating sites] will only lead to more victims of sexually deviant behavior," but provides no specific information to support his asserted concerns. Id. ¶ 14.

Plaintiff Vernon Jones is a Level Three sex offender with a lengthy criminal record, including two attempted rape convictions. Duplessy Decl., ECF No. 30, ¶¶ 3-4. His most recent offense stems from his forcible rape of his 24-year old niece. Id. ¶ 3. Mr. Jones was sentenced to thirteen years imprisonment and five years post-release supervision. Id. His parole officer provides no information about his risk of internet-based recidivism.

Additionally, while a "regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative," the availability of less restrictive alternatives demonstrates why the Ban at issue is "substantially broader than necessary." Ward, 491 U.S. at 800. Much of Mr. Krull's probation officer's declaration is dedicated to discussing the installation of "NetNanny" computer monitoring software on his laptop. Cox Decl. ¶¶ 7-13. But Defendants fail to meaningfully explain why the software could not safely enable Mr. Krull and other Registrants to access social media under the supervision of their parole officers, particularly where Mr. Krull has already

April, 2020." Id. ¶ 9. There is no assertion that any social media website was actually accessed on the phone nor that Mr. Mitchell utilized the phone to make contact with his victim or minors.

been granted access to LinkedIn.[6] Compare Eaglin, 913 F.3d at 98 ("Internet use . . . monitored

by the Probation Office, remain[s] to all outward appearances a viable option. Such a restriction

would adequately protect the public from Eaglin's potential misuse of the Internet while

imposing a more reasonable burden on Eaglin's First Amendment interest in accessing the

Internet."). Mr. Mitchell's parole officer suggests that other internet restrictions may be lifted if

Mr. Mitchell "allows [her] to monitor the device," but states that social media access would

enable him to entice children, locate his victim, and access child pornography.[7] Domenech Decl.

¶¶ 8, 11. As Packingham suggests, the former concerns might be more narrowly addressed by

statutes prohibiting a sex offender from "contacting a minor or using a website to gather

information about a minor" or victim. See 137 S. Ct. at 1737. And even before Packingham, the

Circuit struck down an internet ban release condition for possession of child pornography,

offering as an alternative "a more focused restriction, limited to pornography sites and images,

[that] can be enforced by unannounced inspections of [defendant]'s premises and examination of

material stored on his hard drive or removable disks." United States v. Sofsky, 287 F.3d 122,

126-27 (2d Cir. 2002); see also United States v. Savastio, 777 F. App'x 4, 5 (2d Cir. 2019)

---

[6] The Court notes the apparent discord between Defendants' representation to the Court that parole officers lack discretion to relax e-STOP and Directive 9201's restrictions and the fact that Plaintiff Krull was granted access to LinkedIn. See Cox Decl. ¶ 13; Def. Ltr, ECF No. 23, at 1 ("The Statute requires the Board of Parole to impose certain conditions as a condition of release to ensure public safety."). The clear language of e-STOP and Directive 9201 conveys that the Ban is a "mandatory condition." N.Y. Exec. L. § 259-c(15); Biklen Decl. Ex. 1 at 1. Even if parole officers maintained discretion under the Ban, that alone would be insufficient to remedy the First Amendment overbreadth. See Yunus, 2019 WL 168544, at *16 ("[T]he possibility of certain case-by-case exceptions was insufficient to save other overly broad conditions of supervised release limiting internet or technology access, even when analyzed under a less demanding standard. Therefore, the possibility of case-by-case exceptions from some of these conditions does not exempt them from Packingham, a conclusion reinforced by the nearly blanket manner they have allegedly been applied.") (citing United States v. Sofsky, 287 F.3d 122, 126 (2d Cir. 2002); United States v. Peterson, 248 F.3d 79, 81, 82-84 (2d Cir. 2001)).

[7] There is no allegation that Mr. Mitchell has previously accessed child pornography.

(upholding computer monitoring condition on defendant who viewed child pornography).

It may well be that some of the Registrants subject to e-STOP and Directive 9201 pose a legitimate risk of recidivating using social media. But Defendants' attempt to address this critical concern through a blanket prohibition without first finding that those encumbered are likely to reoffend via social media is incompatible with the First Amendment. See Nebraska, 898 F. Supp. 2d at 1111 (striking down social media and instant messaging ban "triggered by the commission of a crime against children (often committed in the far-distant past) that may be entirely unrelated to whether the offender used (or threatens to use) a social networking web site, instant messaging, or chat room service to victimize minors"); Scott v. Rosenberger, No. 19-cv-1769 (CS), 2020 WL 4274226, at *9 (S.D.N.Y. July 24, 2020) (declining to dismiss challenge to internet ban parole condition imposed on defendant who engaged in sexual conduct with a child where underlying crime did not "involve[] computers or the internet"); Mutter v. Ross, 240 W. Va. 336, 342-43 (S. Ct. W. Va. 2018) (internet ban unconstitutional under Packingham where parolee's "underlying offense did not involve the internet," "he has no history of using the internet to engage in criminal behavior," and "the State has provided no explanation as to how a sweeping ban . . . protect[s] anyone from misconduct . . . or why [its] legitimate interests could not be furthered through less restrictive means").

C.   The Ban is Not Narrowly Tailored in its Application to Social Media Websites

Plaintiffs also argue that the Ban violates the First Amendment by proscribing use of all social media sites for all purposes, including those that do not pose a risk to children. They read the Ban to cover a broad array of websites, including Facebook, Twitter, LinkedIn, Instagram, YouTube, and the New York Times. Additionally, Plaintiffs posit that the Ban's limiting principle—social media sites that allow minors to create profiles—is meaningless where

virtually all mainstream social media websites are available to minors. Defendants respond that the Ban is narrowly written to cover "only true social networking sites" that provide access to minors. Opp. at 14. They argue that other resources, such as non-social media websites, television, print, and radio, provide alternative forums for speech.

While Plaintiffs do not bring a vagueness claim, they note that to the extent the Ban's scope is unsettled, it further chills speech by preventing access to any website that might fall within its purview. The Court agrees that the Ban may be ambiguous in its applicability to some websites. For example, the Court questions whether the ability to publicly comment on a New York Times article or YouTube video is a "direct or real time communication with other users, such as a chat room or instant messenger," and whether the limited user information available on videoconferencing platforms such as Zoom qualifies as "web pages or profiles that provide information about themselves where such web pages or profiles are available to the public or to other users." N.Y. Exec. L. § 259-c(15).

But assuming, as the Supreme Court did, "that the law applies [only] . . . to social networking sites as commonly understood," the restriction nonetheless "enacts a prohibition unprecedented in the scope of First Amendment speech it burdens." Packingham, 137 S. Ct. at 1737 (quotations omitted). As the Seventh Circuit recognized pre-Packingham, "illicit communication comprises a minuscule subset of the universe of social network activity," and "there is nothing dangerous about [the] use of social media as long as [a Registrant] does not improperly communicate with minors." Prosecutor, Marion Cty., Indiana v. Doe, 705 F.3d 694, 699 (7th Cir. 2013). By applying the Ban to a broad swath of protected activities that do not necessarily involve the sexual abuse of minors, the Ban fails to pinpoint "the source of the evils

the [State] seeks to eliminate . . . without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." Ward, 491 U.S. at 800 n.7.

While Defendants emphasize other means by which Plaintiffs may access the information they seek, they minimize the critical role of social media in modern society. Social media can provide "up-to-the-minute information" that is not readily available elsewhere, such as local crime alerts, coronavirus updates, details on ongoing demonstrations, and livestreams on Instagram or Facebook. See Nebraska, 898 F. Supp. 2d at 1117 (discussing the central role of social media in the Arab Spring demonstrations) (quotations omitted). Courts also recognize that the internet provides valuable access to resources that promote reintegration and rehabilitation. See Packingham, 137 S. Ct. at 1737 (The social media ban "bars access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square . . . . Even convicted criminals—and in some instances especially convicted criminals—might receive legitimate benefits from these means for access to the world of ideas, in particular if they seek to reform and to pursue lawful and rewarding lives."); Eaglin, 913 F.3d at 98 ("[I]mposing an Internet ban would arguably *impair* Eaglin's ability to receive needed educational or vocational training, medical care, or other correctional treatment in the most effective manner—one of the goals of sentencing. . . . [A]ccess to the Internet is essential to reintegrating supervisees into everyday life, as it provides avenues for seeking employment, banking, accessing government resources, reading about current events, and educating oneself.") (quotations and citations omitted).

Intermediate scrutiny "does not require a perfect fit between the regulation and the government interest at stake." United States v. Laurent, 861 F. Supp. 2d 71, 99 (E.D.N.Y. 2011). But given e-STOP and Directive 9201's overbreadth as to both whose speech and how much

speech is encumbered, Plaintiffs make a clear and substantial showing that the Ban burdens

substantially more speech than necessary and they are likely to succeed on their claims.

## II.    Plaintiffs Clearly Demonstrate Irreparable Harm

"Irreparable harm is the single most important prerequisite for the issuance of a

preliminary injunction." Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227, 233-34 (2d Cir.

1999) (quotations and citations omitted). "The movant must demonstrate an injury that is neither

remote nor speculative, but actual and imminent and that cannot be remedied by . . . monetary

damages." Id. at 234 (quoting Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 332 (2d Cir. 1995)).

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976) (citation omitted).

By demonstrating that the Ban infringes on protected speech, Plaintiffs have made a

showing of irreparable harm. See Bronx Household of Faith v. Bd. of Educ. of City of New

York, 331 F.3d 342, 349 (2d Cir. 2003) ("Where a plaintiff alleges injury from a rule or

regulation that directly limits speech, the irreparable nature of the harm may be presumed.").

While Defendants point to recent allowances for Plaintiffs' internet access, that Defendants have

suspended other internet restrictions not at issue in this motion does not undo the harm caused by

the social media Ban itself.

The Court declines Defendants' invitation to find that Plaintiffs' alleged delay in filing or

requesting accommodations from their parole officers undermines their claims of irreparable

injury. Plaintiffs were released from prison in 2017, 2018, 2019, and January 2020, and filed

their lawsuit on March 12, 2020. See Opp. at 22 (citing DuPlessy Decl. ¶ 5; Domenech Decl. ¶ 3;

Geh Decl. ¶ 3, Cox Decl. ¶ 2; Osouna Decl. ¶ 5); ECF No 1. That Plaintiffs filed suit just as the

coronavirus pandemic forced most of American life online provides strong justification for the timing and particular urgency of this motion.

## III.     The Balance of Equities and Public Interest Favor Plaintiffs

As Plaintiffs argue, "securing First Amendment rights is in the public interest," and "[t]he Government does not have an interest in the enforcement of an unconstitutional law." New York Progress & Prot. PAC v. Walsh, 733 F.3d 483, 488 (2d Cir. 2013) (quoting Am. Civil Liberties Union v. Ashcroft, 322 F.3d 240, 247 (3d Cir. 2003)). On the other hand, Defendants and the public's interest in preventing recidivist sex offenders from contacting vulnerable children on the internet is extremely compelling. But Defendants do not explain why these interests cannot be served by the imposition of tailored social media restrictions on individual Registrants based on their respective proclivities and conduct. See 9 CRR-NY 8003.3 ("A special condition may be imposed upon a releasee either prior or subsequent to release. . . by a member or members of the Board of Parole, an authorized representative of the Division of Parole, or a parole officer."). Instead, the State asks the Court to find that even if Plaintiffs present only a "minimal" risk of reoffending via the vehicle of social media, "the potential harm to Plaintiffs [of] some additional inconvenience during the pendency of the litigation" is outweighed by the irreparable harm that reoffending would cause the public and children. Opp. at 20-21. There are important—indeed, constitutionally protected—interests on both sides of this claim, and the State does not demonstrate why the evils it identifies would necessarily come to fruition in the absence of e-STOP and Directive 9201. The balance of equities and public interest tip in favor of Plaintiffs.

## IV.     A Facial Injunction is Warranted in this Case

Plaintiffs bring facial and as applied claims. In First Amendment overbreadth challenges, "showing that a law punishes a 'substantial' amount of protected free speech, 'judged in relation

to the statute's plainly legitimate sweep,' suffices to invalidate *all* enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'" <u>Virginia v. Hicks</u>, 539 U.S. 113, 119 (2003) (quoting <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 613, 615 (1973)). "[A] state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction . . . ." <u>Erznoznik v. City of Jacksonville</u>, 422 U.S. 205, 216 (1975) (citations omitted).

The Ban outlaws a substantial amount of protected speech as compared to its legitimate sweep. <u>See</u> <u>Hicks</u>, 539 U.S. at 119. It prohibits, at a minimum, access to all major social media websites, regardless of whether they are used for permissible speech. And while the parties do not provide information as to the number of Registrants subject to the Ban who have not in some way utilized the internet in the commission of their offenses, the Ban's overbreadth is significant; it is likely unconstitutional as applied to all Plaintiffs and as applied to two of the three categories of Registrants covered by the statute (*i.e.* Registrants who did not use the internet in the commission of their crime and either are a Level Three sex offender or committed an offense against a minor). Further, the Ban's proscription is not amenable to a judicial reading that would remedy the constitutional deprivation. It plainly applies to two problematic categories of Registrants and at least as broadly to social media websites as the ban in <u>Packingham</u>. The Court thus preliminarily enjoins e-STOP and Directive 9201 to the extent they apply to Registrants who have not used the internet to facilitate the commission of their underlying sex offense.

The Court emphasizes that nothing in this opinion casts doubt on the appropriateness of judicial or parole determinations that the specific circumstances of an individual Registrant subject to supervision warrant restrictions on social media access. The Court does not foreclose

the possibility that even Registrants, like Plaintiffs, who have not used the internet in the commission of an offense may have engaged in conduct that, upon careful consideration, raises legitimate concerns about their risk of reoffending using social media. But by proscribing social media access in one fell swoop for a large group of Registrants, e-STOP and Directive 9201 do not sufficiently reconcile the compelling interest of protecting children with the fundamental First Amendment rights at stake.

## CONCLUSION

As Packingham recognizes, "the 'vast democratic forums of the Internet' in general, and social media in particular," have become "the most important places . . . for the exchange of views." 137 S. Ct. at 1735 (quoting Reno, 521 U.S. at 868 (1997)). Social media "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard. They allow a[ny] person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox.'" Id. at 1737 (quoting Reno, 521 U.S. at 870). But on the flip side, social media also provides vast opportunities for abuse as a low-cost and often anonymous channel for criminal activity. Mindful that balancing these two considerations strikes at the heart of the issues raised in this case, the Court finds that Plaintiffs have carried their burden of demonstrating that a preliminary injunction is warranted. e-STOP and Directive 9201 are preliminarily enjoined as to Registrants who have not used the internet to facilitate the commission of their underlying sex offense.


SO ORDERED.


Dated: Brooklyn, New York           /s/ Raymond J. Dearie
       September 9, 2020           RAYMOND J. DEARIE
                               United States District Judge